**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| WILLIAM J. DONOHUE,<br><br>    Plaintiff,<br><br>        v.<br><br>JEFFERY RINEER and GEORGE CRONIN,<br><br>    Defendants. | CIVIL ACTION NO. 3:10-CV-1324<br><br>(JUDGE CAPUTO) |

## **MEMORANDUM**

Following the acquittal of William Donohue on charges of murder and conspiracy to commit murder, he filed a complaint against the two Pennsylvania State Troopers who were affiants on the affidavit of probable cause which resulted in a warrant being issued for Donohue's arrest. The complaint brought a claim of malicious prosecution in violation of the Fourth Amendment pursuant to 42 U.S.C. § 1983. The defendants move for summary judgment, arguing that they are entitled to judgment because the plaintiff lacks sufficient evidence on the elements of his claim. For the reasons explained below, the motion will be granted.

### **I. Background**[1]

On May 20, 2004, Frances Donohue called 911 to report the death of her eighty-

---

[1] On summary judgment, the facts are stated in the light most favorable to the plaintiff. As discussed herein, the plaintiff failed to controvert many of the defendants' assertions by citation to evidence in the record. Also, the plaintiff's counterstatement frequently discussed "facts" not cited to in the record (which the Court thus disregarded) or cited to a document not submitted to the Court (the citations to a document denominated "N.T.").

1

seven-year-old mother-in-law, Bernadette Leiben. One of the responders to the scene, Pennsylvania State Trooper Jeffrey Rineer, noted that the body was unkempt, that there were no sheets on the bed, that bed pads were stained with bodily fluids, and that there was a foul odor and an abundance of black flies throughout the bedroom.

When the deputy coroner arrived, she uncovered gaping wounds and maggots on Leiben's body. The next day the maggots were collected, preserved, and shipped to Dr. Neal Haskell who made findings that the unsanitary conditions supporting maggot growth would have been present for at least about two weeks before Leiben's death. An investigation ensued.

**A. Investigation**

Pennsylvania State Troopers Jeffrey Rineer and George Cronin were the investigating officers. During this investigation, Rineer and Cronin reviewed many of Leiben's medical records. These records showed that on February 13, 2002, the Greater Baltimore Medical Center discharged Leiben to the Brightwood Center, an extended care facility in Maryland, for pain management and rehabilitation. On March 13, 2002, Leiben left Brightwood Center under the care of her son, William Donohue, and William's wife Frances Donohue. That same day Leiben executed a document naming Frances Donohue power of attorney over all Leiben's legal and financial affairs.

When the Donohues failed to attend the meeting with the Brightwood Center's medical staff to discuss discharge instructions, the Center contacted Adult Protective

Services for the Baltimore County Department of Social Services.[2] In April and May 2003, Adult Protective Services determined that Leiben was in danger of abuse or neglect by the Donohues.

On April 9, 2003, the Donohues purchased a farm in Airville, Pennsylvania. The Baltimore County Department of Social Services terminated its supervision of Leiben and the Donohues because they were moving to Pennsylvania. The Donohues stopped maintaining medical insurance for Leiben, and her last visit with a physician was with Dr. Vieta in Maryland on May 14, 2003. The Donohues did not maintain Leiben's prescriptions.[3]

Trooper Cronin contacted the Maryland State Police seeking information about Leiben and the Donohues. He was informed that on June 1, 2001, a police report was filed relating to Leiben. The report noted that an attorney named Ralph Caskey had called the police to report that Leiben, his client, had contacted him saying she felt threatened by the Donohues, and that when Caskey arrived at the residence Wiliam Donohue confronted him about his involvement with Leiben. No arrest was made.

Following this lead, on July 8, 2005, Trooper Cronin contacted Attorney Caskey and

---

[2] This assertion is drawn from paragraph 11 of the defendants' statement of material fact (Doc. 23 at 4). In the plaintiff's counter-statement of material fact, he submits a blanket "denial" of the defendants' statement but fails to controvert it by a reference to the part of the record that supports such a denial in accordance with Local Rule 56.1. Thus, by application of this local rule, the defendants' statement is deemed admitted. Indeed, several times the plaintiff denies the assertions of the defendant but fails to cite to the record. Additionally, the plaintiff cites to a document labeled "N.T." The Court does not know what this document is, but notes that various page numbers including 400, 401, 447, and 619 are cited (*see* Doc. 35 at 4). The Court has looked in vain for a document in the record containing such page numbers, and must conclude that this evidence was not submitted. Therefore, the Court cannot consider it.

[3] Again, the plaintiff disputes some of these assertions with a blanket denial but does not state how they are inaccurate and neglects to cite to evidence in the record. There are some citations to a document abbreviated "N.T.," which the Court speculates is the trial transcript, but this has not been entered into evidence. Moreover, the assertions made are not inconsistent with, and thus do not controvert, the assertion made in the defendants' statement of material fact, namely that the Donohues did not maintain Leiben's prescriptions. (*See* both parties' statements of material fact, Docs. 23, 35, at ¶ 12.)

interviewed him over the phone. Caskey stated that he had felt that the Donohues would bring harm or death to Leiben, and that he had witnessed the Donohues being verbally abusive towards Leiben. He further stated that he had advised Leiben to get away from the Donohues, and that William Donohue had threatened him and did not want Caskey speaking with his mother. Caskey further stated that he assisted Leiben pro bono out of concern for her situation but ceased helping her when she repeatedly refused to take his advice.[4]

In a taped interview on November 14, 2006, Caskey stated that the Donohues convinced Leiben to put their names on the deeds to her rental properties as joint tenants with right of survivorship.[5] Caskey also stated that he considered filing for bankruptcy on Leiben's behalf to break the Donohues' control over her, but Leiben declined because she was afraid of the Donohues and did not want to lose her dog. Caskey further relayed that he tried to advise Leiben against giving the Donohues power of attorney.

The investigation also revealed that Leiben was receiving monthly social security checks in care of her son William Donohue, which were sent to a post office box in Maryland even after she had moved to Pennsylvania. The power of attorney that Frances Donohue had over Leiben was used when her property in Maryland was sold in 2003, and was also used to transfer money to Frances and William Donohue's bank account.

Throughout the investigation, Troopers Rineer and Cronin conducted numerous

---

[4] While the plaintiff disputes the defendants' assertions about Caskey's interview, he fails to provide record evidence controverting their assertions.

[5] The plaintiff argues that Lieben had transferred everything to his name back in 1982, and that Caskey's interview was mere speculation and conjecture. However, there is nothing cited to in the record indicating that the troopers had reason to disbelieve or question Caskey, or that they were aware of, and disregarded, evidence that properties had been transferred to plaintiff in 1982. The actual status of the properties is irrelevant to the malicious prosecution claim; what is relevant is whether the troopers had probable cause to charge the plaintiff based on the information they had.

4

interviews of the Donohues. In a report Rineer wrote the same day as a June 7, 2004 interview, Rineer noted that William Donohue told him that "he usually saw his mother on a daily basis, but left the care to his wife. William Donohue said he would usually take his mother coffee and donuts every morning. William also said his mother liked to drink Ensure and Slim Fast." In this same report, William Donohue said he was unaware that there was a hole in his mother's shoulder and that he had no idea there were maggots on her body. Additionally, in this report, Rineer notes that Frances Donohue admitted to being neglectful, that indicated her total responsibility for Leiben's care and that she was to blame. She emphasized that William Donohue was not involved in caring for Leiben. The report notes that Frances Donohue stated, "if there is such a thing as criminal neglect, then I should pay the consequences."

On December 14, 2006, Troopers Rineer and Cronin interviewed William Donohue again. The interview took place at his home and was audiotaped. In the interview, William Donohue disclaimed having profited from his mother's death, which he asserted took him by surprise. While he admitted that he brought his mother coffee and talked to her at times, he said he never noticed a strange odor, but also explained that he had a "busted nose" as well as horses and dogs around whose scent might interfere with his ability to detect other odors.

On many occasions, the officers attempted to contact Frances Donohue for an interview. On December 17, 2006, Frances returned a phone call and left a voicemail after the officers had interviewed her husband.

Frances Donohue was ultimately arrested and charged for her role in her mother-in-law's death. Following her arrest, on March 15, 2007, Rineer and Cronin interviewed her. The interview transcript reads in part as follows:

5

> **Cronin:** And Bill says he use [*sic*] to go up every morning to give her coffee and things like that?
>
> **A:** Yes. Yes.
>
> **Cronin:** You remember that? That's true.
>
> **A:** Oh yes, Well, yes. She would give him coffee, he would, she would want coffee and donuts in the morning. If she called him, only if she called him.

Based on the information that the investigation had revealed, Troopers Cronin and Rineer requested, via an affidavit of probable cause, a warrant to be issued for the arrest of both Frances Donohue and William Donohue for the offenses of murder on the first degree, murder of the third degree,[6] and conspiracy to commit these crimes.

**B. The Affidavit of Probable Cause**

The affiants, Troopers Rineer and Cronin, averred as follows:

Leiben was removed from her extended care facility by the Donohues on the same day that she executed a document naming Frances Donohue power of attorney over all her affairs. Leibens's attorney had told the affiants that the Donohues convinced Leiben to put their names on the deeds to her rental properties as joint tenants with the right of survivorship. The attorney had been so concerned about Leiben's treatment that he had hatched a plan to file bankruptcy on Leiben's behalf to wrest Leiben from their control. At this time, the attorney contacted the Baltimore County Department of Social Services to find a place for Leiben to stay while the bankruptcy action was processed. Frances Donohue told the attorney that Leiben did not need to file for bankruptcy, and Leiben eventually declined

---

[6] The defendants' statement of material fact at paragraph 37 lists the crime charged as murder of the *second*, not third, degree. Indeed, the plaintiff admits to the crime as listed in the defendants' statement in his counterstatement. However, the record reveals that the crime charged was murder in the third degree, so the Court assumes that this was a typographical error overlooked by both parties.

to do so because she feared repercussions from the Donohues. He instructed Leiben to stay in the extended care facility and told her he would help her break free from the Donohues. Thereafter, Frances Donohue called the attorney, saying that she and her husband were removing Leiben from the facility because Leiben had changed her mind and wanted to go home with them—when the attorney arrived at the facility, Leiben had already been removed. After Leiben left the facility, the attorney received a call from a bank manager informing him that the Donohues and Leiben were at the bank with a power of attorney document to transfer all of Leiben's money into Francis Donohue's accounts. The attorney stated that the Donohues knew he represented Leiben and advised her not to execute a power of attorney document.

When Leiben was removed from her extended care facility, the Donohues failed to attend the meeting with medical staff to discuss discharge instructions. This failure led the staff to contact Adult Protective Services, which evaluated and provided services for a year and determined in April and May of 2003 that Leiben was in danger of abuse or neglect by the Donohues. Shortly thereafter, the Donohues moved Leiben to Pennsylvania, stopped maintaining medical insurance for Leiben, did not arrange for medical care, and did not maintain her prescriptions. The last physician to see Leiben before her death, Dr. Vieta, saw her on May 14, 2003.

On May 20, 2004, Francis Donohue contacted 911 and informed the operator that Leiben had died. When emergency personnel arrived, the confirmed her death. Dr. Vieta refused to sign the death certificate because of the long treatment interval that had elapsed. The Pennsylvania State Police responded to the scene. Donohue was lying on her bed with no bedsheed, there were many flies in the bedroom, her toenails were uncut. The coroner

on the scene uncovered numerous bedsores and maggots on Leiben's body. The autopsy performed the next day revealed large ulcers (some so severe that muscle and bone were exposed) and abrasions caused by chemicals on Leiben's back and right side.

The records obtained during the investigation were submitted to Dr. Kathleen Brown of the University of Pennsylvania, who is an expert in elder care and a forensic nurse. Dr. Brown opined that Leiben's death was preventable with appropriate nutrition, sanitation, and medical care, and that the Donohues had systematically deprived Leiben of all supportive and medical care until she suffered a painful death.

**C. Procedural Background**

Based on the affidavit of probable cause which was presented to a magisterial district judge to obtain an arrest warrant, on March 14, 2007, Donohue and his wife were arrested. Following a trial, William Donohue was acquitted of all charges. He filed a complaint against Cronin and Rineer under 42 U.S.C. § 1983, claiming that they maliciously prosecuted him in violation of his Fourth Amendment rights. The defendants moved for summary judgment on the grounds that Donohue cannot introduce sufficient evidence on all the elements of his malicious prosecution claim. Donohue opposes the motion. The motion is fully briefed and ripe for review. Because Donohue has not met his burden of showing that there is a genuine issue of material fact, judgment will be entered in the defendants' favor.

**II. Discussion**

**A. Legal Standard for Summary Judgment**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).

A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c)(2). Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Anderson*, 477 U.S. at 248. An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id.* Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law. *See* 2D Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2727 (2d ed. 1983). The moving party may present its own evidence or, where the nonmoving party has the burden of proof, simply point out to the court that "the nonmoving party has failed to make a sufficient showing on an essential element of her case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party. *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988). Once the moving party has satisfied its initial burden, the burden shifts to the non-moving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *Anderson*, 477 U.S. at 256–57. The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*,

497 U.S. 871, 888 (1990).

"To prevail on a motion for summary judgment, the non-moving party must show specific facts such that a reasonable jury could find in that party's favor, thereby establishing a genuine issue of fact for trial." *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 270 (3d Cir. 2007) (citing Fed. R. Civ. P. 56(e)).  "While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla."  *Id.* (quoting *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005)). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## B. Malicious Prosecution

While the Supreme Court has never "explored the contours of a Fourth Amendment malicious prosecution suit under § 1983," *Wallace v. Kato*, 549 U.S. 384, 390 n.2 (2007), the Third Circuit has held that a plaintiff must establish the following elements:

(1) the defendants initiated a criminal proceeding;

(2) the criminal proceeding ended in plaintiff's favor;

(3) the proceeding was initiated without probable cause;

(4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and

(5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.

*Estate of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003).

The defendants argue that the plaintiff cannot sustain his claim because he lacks

sufficient evidence on the first, third, and fourth elements of the malicious prosecution claim. Because the gist of the plaintiff's claim is that the defendants' affidavit was necessary to initiate the proceeding, he has shown that the first element is filled, and the third element, lack of probable cause, will be considered.

**C. Probable Cause**

Probable cause exists when "the totality of the circumstances within an officer's knowledge is sufficient to warrant a person of reasonable caution to conclude that the person being arrested has committed, or is committing, an offense." *United States v. Laville*, 480 F.3d 187, 189 (3d Cir. 2007). When false arrest is at issue, "probable cause need only exist as to [one of the] offense[s] that could be charged under the circumstances." *Barna v. City of Perth Amboy*, 42 F.3d 809, 819 (3d Cir. 1994). In the context of malicious prosecution, however, probable cause must exist as to each of the offenses charged. *Johnson v. Knorr*, 477 F.3d 75, 83 (3d Cir. 2007). Although the existence of probable cause is usually a question of fact for the jury, probable cause is established as a matter of law if the facts, viewed in the light most favorable to the plaintiff, would not support a contrary finding. *Estate of Smith v. Marasco,* 318 F.3d 497, 514 (3d Cir. 2003).

Here, the warrant application clearly establishes probable cause as to all the charges brought. The warrant establishes that the Donohues had convinced Leiben to give them power of attorney; that Leiben was scared of the Donohues; that the Donohues had convinced Leiben to put the Donohues on the deeds to her rental properties as joint tenants with right of survivorship; that the Donohues had removed Leiben from her extended care facility without attending the meeting with medical staff to discuss discharge instructions; that protective services had deemed Leiben at risk of abuse by the Donohues; that Leiben's

11

medical care was neglected over months while she resided in the same house as Francis and William Donohue; and that she died a painful and preventable death that an expert concluded was the result of systematic deprivation of care. These facts would warrant a "reasonable competent officer" in concluding that probable cause existed to charge William Donohue with murder in the first and third degrees as well as conspiracy to commit those crimes with his wife.

When an arrest is made pursuant to a warrant that on its face establishes probable cause, to succeed on a claim of malicious prosecution a plaintiff must show, by a preponderance of the evidence: "(1) that the officer 'knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant;' and (2) that 'such statement or omissions are material, or necessary, to the finding of probable cause.'" *Wilson v. Russo*, 212 F.3d 781, 786–87 (3d Cir. 2000) (quoting *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997)). In other words, when a plaintiff claims that the warrant was deficient, the plaintiff must show that the affiant "recklessly disregarded the truth in his warrant application, *and* that a warrant application based on what [the affiant] should have told the judge would have *lacked* probable cause." *Wilson*, 212 F.3d at 786 (emphasis in original).

**A. Reckless Disregard**

Thus, on summary judgment a court faced with a claim that a warrant contains misleading statements and omissions first determines whether the plaintiff has introduced sufficient evidence to show that the defendant falsely asserted or omitted information when applying for a warrant either deliberately or with reckless disregard of the truth. *Reedy v. Evanson*, 615 F.3d 197, 213 (3d Cir. 2010).

12

An omission is made with reckless disregard for the truth when the officer "recklessly omits facts that any reasonable person would know that a judge would want to know" and "assertions are made with reckless disregard for the truth when an officer has obvious reasons to doubt the truth of what he or she is asserting." *Wilson*, 212 F.3d at 783.

Here, the defendants are not clear about what statements in the affidavit of probable cause were false or which statements were omitted. In his brief, he primarily argues that the evidence *at trial* was not convincing, and thus the prosecution must have been malicious. He states, ""[i]f the jury thought there was any evidence whatsoever against him, they would have found him guilty of involuntary manslaughter just like they did with Frances . . . the jury's reasoning and decision is nonetheless highly probative as to the presence of absence of probable cause."

A jury's acquittal at the time of *trial*, however, is not dispositive as to the existence of probable cause at the time of *arrest*. To convict, a criminal defendant must be found guilty beyond a reasonable doubt, *In re Winship*, 397 U.S. 358, 361 (1970), while probable cause exists "if there is a 'fair probability' that the person committed the crime at issue," *Wilson*, 212 F.3d at 789. Moreover, evidence not admissible at trial may be used for the probable cause determination. *See Illinois v. Gates*, 462 U.S. 213, 241–42 (1983) (an affidavit relying on hearsay acceptable where a substantial basis for crediting the hearsay is presented). Thus, the Court gives no weight to the fact that Donohue was acquitted,[7] and instead looks to whether the evidence at the time of arrest was sufficient to create probable cause in light of

---

[7] Likewise, the Court gives no weight to the testimony at trial. The plaintiff repeatedly discusses the testimony at trial and its deficiencies (although he does not provide a transcript), but what was in evidence at trial is not relevant to the question of whether the defendants had probable cause at the time the plaintiff was arrested.

13

the totality of the circumstances.

While the plaintiff does not specify the material facts that he believes are missing[6] from the affidavit, the Court garners from his submissions certain facts he wishes to underscore. The plaintiff emphasizes the fact that he had no control over his mother's financial affairs or personal well being. He asserts that his wife was in complete control over his mother. Additionally, he argues that he did not tell the officers that he took his mother coffee and donuts every day; instead, he told them he visited her only sporadically. Additionally, he notes that although Attorney Caksey told the officers that Leiben deeded her rental properties to him, in truth, his name was on the deeds dating back to 1982.

Viewing the facts in the light most favorable to the plaintiff, any reasonable person would want the judge reviewing the affidavit of probable cause to know that Donohue and his wife claimed he was not responsible for his mother's daily care and that Donohue claimed he did not see Leiben every day, so that the judge could evaluate in light of the totality of the circumstances the reasonableness of inferring William Donohue's intent or knowledge. As to the 1982 date on the properties, because Caskey's assertion about deeding the rental properties to the Donohues was present in the affidavit of probable cause, a reasonable person would want the judge to know that his name was alongside his mothers on some deeds going back to 1982.

Thus, the plaintiff has raised a question of whether the officers omitted information from the affidavit of probable cause in reckless disregard of the truth.

---

[6] The plaintiff has not argued that any assertion in the affidavit was false, and so the Court only addresses whether there were material omissions. Although the plaintiff discusses other facts in his briefing (for example, that his mother would call him from Brightwood requesting that someone pick her up, *see* Doc. 35 at 4), he provides no evidence that these facts were known to the investigating officers.

**B. Materiality**

It is not enough that a reasonable jury could conclude that the defendants omitted information from the affidavit in reckless disregard of the truth. For the plaintiff to prevail, the false statements or omissions must be *material*; courts do not demand "that police officers relate the entire history of events leading up to a warrant application with every potentially evocative detail that would interest a novelist or gossip . . . ." *Wilson*, 212 F.3d at 787. To determine materiality, the court performs "reconstructive surgery" and assesses whether the false or missing statements, if corrected or inserted, would result in a warrant application establishing probable cause. *Wilson*, 212 F.3d at 789. If it would, then summary judgment must be granted in favor of the defendants because "even if there had not been omissions and misrepresentations" in the affiants' presentation to the judge, the warrant would have issued. *See Wilson*, 212 F.3d at 789.

Here, even if the affidavit had stated that William Donohue and his wife claimed he was not responsible for his mother's care, it would not have changed the determination that probable cause existed. "A self-serving denial . . . does not defeat probable cause." *United States v. Sarras*, 575 F.3d 1191, 1219 (11th Cir. 2009). Under the totality of the circumstances, the evidence even in a "corrected affidavit" more than establishes probable cause for all the crimes charged. Although the fact that the rental properties had William Donohue's name on them in 1982 is relevant, under the totality of the circumstances no reasonable trier could find that probable cause was lacking even if this information was before the judge.

The plaintiff disagrees, and contends that there are no facts to support a murder charge. (*See* Doc. 36 at 12 ("To begin there was no murder case here . . . . [and] absolutely

15

no evidence of any conspiracy because there is absolutely no evidence that Bill was implicated or involved in any way in the care of Bernadette or the neglect she may have suffered from."))

In Pennsylvania, a criminal homicide is murder in the first degree when it is committed by an intentional killing. 18 Pa. C.S. § 2502. Murder in the third degree is all kinds of murder that are not of the first or second (felony murder) degree. *Id.* Where there is evidence that death is caused by the intentional withholding of food, abuse, and neglect, a finding of the requisite intent for first degree murder will be sustained. *See Commonwealth v. Tharp*, 830 A.2d 519, 528 (Pa. 2003).   Here, the "corrected affidavit" would warrant a reasonably prudent officer in believing that Donohue deliberately cut off sanitation, nutrition, and medical care, and conspired to do so with his wife, resulting in Leiben's death. *See Commonwealth v. Pestinikas*, 617 A.2d 1339, 1345 (Pa. Super. Ct. 1992) (holding that evidence is sufficient to support a first degree murder conviction where it evinced an "affirmative course of conduct calculated to deprive [the elderly victim] of the food and medical care which was otherwise available to him and which was essential to continued life . . . includ[ing] efforts to place [the victim] beyond the ability of others to provide such needs.")

Because the plaintiff has failed to respond to the defendants' motion by introducing evidence showing a lack of probable cause to initiate a criminal proceeding against him, his malicious prosecution claim fails and summary judgment in the defendants' favor is appropriate.

The Court further notes that the plaintiff has introduced no evidence that the defendants acted maliciously or with an intent other than to bring the plaintiff to justice, and thus has also failed to meet his burden on the fourth prong of a malicious prosecution claim.

For this reason too, his claim does not withstand summary judgment.

### III. Conclusion

As discussed above, the plaintiff has failed to show that there is a genuine issue of material fact precluding summary judgment. Based on the evidence in the record, no reasonable trier of fact could find that the defendants omitted facts from or made misleading assertions in their affidavit that, if corrected, would result in a lack of probable cause. Moroever, there is no evidence that the defendants acted with malice. Thus, the plaintiff's malicious prosecution claim fails, and summary judgment in the defendants' favor is warranted. An appropriate order follows.


August 5, 2011                                        /s/ A. Richard Caputo
Date                                                  A. Richard Caputo
                                                      United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| WILLIAM J. DONOHUE, | |
| Plaintiff, | NO. 3:10-CV-1324 |
| v. | |
| JEFFERY RINEER and GEORGE CRONIN, | (JUDGE CAPUTO) |
| Defendants. | |

### **ORDER**

**NOW**, this 5th day of August, 2011, **IT IS HEREBY ORDERED** that the defendants' motion for summary judgment (Doc. 22) is **GRANTED.**  Judgment is **ENTERED** in the defendants' favor. The clerk of court is directed to mark this matter **CLOSED**.

/s/ A. Richard Caputo
A. Richard Caputo
United States District Judge